**Odell POLLARD, Individually and as Chairman of the State Committee of the Republican Party of Arkansas; Charles Bernard, Individually and as Treasurer of the State Committee of the Republican Party of Arkansas; Howard Vance, Individually and as Secretary of the State Committee of the Republican Party of Arkansas; the Republican Party of Arkansas, an unincorporated association, Plaintiffs,**

v.

**Russell C. ROBERTS, Individually and as Judge of the Circuit Court of Faulkner County, Arkansas; Jeff Mobley, Individually and as Prosecuting Attorney of Faulkner County, Arkansas; the First National Bank in Little Rock, a corporation doing business under the banking laws of the State of Arkansas, Defendants.**

### No. LR–67–C–143.

United States District Court
E. D. Arkansas, W. D.
April 11, 1968.

250

Rock, Ark., and Jeff Mobley, pro se, for defendants.

Before BLACKMUN, Circuit Judge, and HENLEY and HARRIS, District Judges.

HENLEY, District Judge.

This suit in equity, which has been heard by a statutory court of three judges, 28 U.S.C.A. §§ 2281 and 2284, presents the question of whether the Arkansas statute which confers the subpoena power on Arkansas prosecuting attorneys[1] violates the Constitution of the United States.

Plaintiffs in the case are the Chairman, Secretary, and Treasurer of the Republican Party of Arkansas, an unincorporated association which is a branch of the National Republican Party in the United States, and the Republican Party of Arkansas itself (hereinafter sometimes called the Party).

The principal defendant is Hon. Jeff Mobley, Prosecuting Attorney of the Fifth Judicial Circuit of Arkansas, which includes Faulkner County. Prosecutor Mobley, hereinafter at times called simply the defendant, has issued and is attempting to enforce certain subpoenas duces tecum directed to the plaintiffs and to The First National Bank in Little Rock, Arkansas, calling for the production for inspection and copying the records of a certain checking account established by the Party in 1966 in the name of Mrs. Wanda Tudor in the Bank which has been mentioned.[2] Those records, if

---

Hartman Hotz and Robert R. Wright, Fayetteville, Ark., Bill Penix, of Penix & Penix, Jonesboro, Ark., for plaintiffs.

Joe Purcell, Atty. Gen., by Don Langston, Asst. Atty. Gen., W. J. Smith, Little

---

1. Act 160 of 1937 Ark.Stats.Ann. § 43–801 et seq. Section 1 of that statute is as follows: "The prosecuting attorneys and their deputies shall have authority to issue subpoenas in all criminal matters they are investigating; and shall have authority to administer oaths for the purpose of taking the testimony of witnesses subpoenaed before them; such oath when administered by the prosecuting attorney or his deputy shall have the same effect as if administered by the foreman of the grand jury. * * *" The statute implements Amendment 21 to the Constitution of the State of Arkansas, which amendment permits prosecutions of fel-

ony charges on informations filed by prosecuting attorneys as well as on indictments returned by grand juries. Leflar, The Criminal Procedure Reforms of 1936–Twenty Years After, 11 Univ. of Ark.Law Review 117 et seq.

2. Another defendant in the case is the Hon. Russell C. Roberts, Circuit Judge of the Fifth Judicial Circuit. Judge Roberts is in the case because refusals to obey subpoenas issued under Act 160 are punishable as contempts of the Circuit Court. The Bank is also named as a defendant; however, it is aligned in interest with the plaintiffs.

produced, would reveal information not only as to sums of money contributed to the Party during the 1966 campaign [3] and deposited in the Tudor account along with information as to disbursements from that account, but also would identify individual contributors from all over the State whose contributions were deposited in the account in question and would reveal the amounts of individual contributions.

The defendant claims that he is conducting a bona fide investigation of suspected violations of the Arkansas election laws allegedly committed on behalf of Republican candidates during the 1966 campaign, that the records which he is seeking to have produced contain or may contain relevant evidence with respect to such violations and that production of the records is necessary if the investigation is to be carried out properly.

Plaintiffs say that the investigation which the defendant claims to be making is not genuine or in good faith but is mere harassment of the Party and amounts to an abuse of process; that the design of the defendant is not to obtain information which would legitimately advance an investigation of election law violations but rather to injure the Party in Arkansas and inhibit its growth; that the production of the records of what may be called the Tudor account and the publication of the information contained therein would result in irreparable injury to the Party and to its contributors and workers; and that plaintiffs have federally protected rights not to disclose that information or have it disclosed by the Bank, which rights should be vindicated in this action by the Court's enjoining further attempts to enforce the subpoenas. Plaintiffs contend that the statute in question is unconstitutional both as written and in application.

Federal subject matter jurisdiction is established, and the Court and counsel are satisfied that the case is a proper one for a three judge court. The case has been submitted on the pleadings, certain evidentiary material, memorandum briefs, and oral arguments. There is no real dispute about the facts, although the significance of those facts, the implications thereof, and the inferences to be drawn therefrom are sharply disputed.

During the 1966 campaign certain checks in comparatively small amounts were drawn on the Tudor account in favor of persons residing in Faulkner County and other counties in the Fifth Circuit. The faces of the checks indicated that they were drawn in payment for campaign services such as knocking on doors, ringing doorbells, and other activities designed to "get out the vote" for Republican candidates.

The existence of those checks came to the attention of the Prosecuting Attorney who commenced an investigation to determine whether there had been violations of the Arkansas general election laws, including the statute which makes it a felony to buy votes in a general election, Ark.Stats.Ann., § 3–1415. That investigation was at least accelerated in March 1967 when the Arkansas Senate adopted a resolution calling on the defendant to make or press the investigation in question.

Ostensibly for reasons of economy the defendant decided to proceed under Act 160 of 1937 rather than to ask the Circuit Court to impanel a grand jury to conduct the investigation. Defendant construed the statute as authorizing him to issue subpoenas duces tecum and also as authorizing him to sit as a "one man grand jury," examining witnesses in camera and in the absence of counsel.

Two subpoenas duces tecum calling for the records of the Tudor account were is-

---

3. Between Reconstruction and the 1966 campaign Arkansas was essentially a one party State; during that period the Democrats were in control of all three branches of the State Government. As a result of the 1966 campaign, the Re-publicans were able to elect the Governor and Lieutenant Governor and one Congressman, but at other political levels the Republicans fared no better than usual.

sued; one was directed to Mrs. Tudor, and the other was directed to the Bank. The subpoena directed to Mrs. Tudor was designed to bring about the production of the Party's own records, but no subpoena was directed to the Party itself or to any responsible officer of the Party. It should be said at this point that the records of the Party and the records of the Bank covering the Tudor account reflect essentially the same information so that if one set of records is produced, it really makes no difference to the defendant whether the other set is forthcoming.

In addition to the subpoenas duces tecum just mentioned, the defendant issued ordinary witness subpoenas for a number of persons named as payees in the checks drawn on the Tudor account, including one Lucy Gill. Defendant proposed to question those witnesses in the absence of their attorney.

Mrs. Tudor and the Bank resisted the subpoenas in the State courts, and Mrs. Gill and others similarly situated resisted being questioned by the defendant in the absence of their attorney. The litigation in the State courts produced three opinions of the Supreme Court of Arkansas, all handed down on June 5, 1967. Tudor v. Roberts, Judge, 242 Ark. 795, 415 S.W. 2d 557; Gill v. State ex rel. Mobley, Prosecuting Attorney, 242 Ark. 797, 416 S.W.2d 269; First National Bank in Little Rock v. Roberts, Judge, 242 Ark. 912, 416 S.W.2d 316.

In resisting the subpoena served on her Mrs. Tudor pointed out that she was no longer an employee of the Party, was not in possession of the records of the Tudor account and could not produce them. Her explanation was not satisfactory to the Circuit Court, and she was adjudged in contempt. The Arkansas Supreme Court reviewed on certiorari the judgment of the Circuit Court and reversed it; that ended the affair as far as Mrs. Tudor was concerned.[4]

In the Gill case the Supreme Court held that Prosecutor Mobley did not have the right to question witnesses in the absence of counsel if the witnesses insisted on having counsel present while being interrogated.

In resisting the subpoena served on it the Bank acted on its own account and in its own interest; it did not purport to represent the Party, nor did it claim that to produce the records would violate any rights of the Party or of Party members or contributors. Cf. Kilgore National Bank v. Federal Petroleum Board, 5 Cir., 209 F.2d 557. The Supreme Court of Arkansas rejected the contentions of the Bank and held that the Bank would have to produce the records if Faulkner County was able and willing to pay the expenses of locating and reproducing relevant documents. The Bank moved for rehearing, but its motion was denied in July 1967. The mandate of the Supreme Court was duly issued and filed.

On September 15, 1967, defendant notified the Bank that the County was willing to pay the expenses which have been mentioned, and that he was renewing his demand for the production of the Bank's records. On the same day defendant issued new subpoenas duces tecum calling for production of the Party's records covering the Tudor account; those subpoenas were directed to the plaintiffs in this case.

The renewed efforts of defendant to get the records brought about more litigation in both the Circuit Court of Faulkner County and in the Supreme Court of Arkansas, but did not result in any further published opinions of the Supreme Court. As far as the Party records were concerned, the Arkansas Supreme Court restrained further proceedings under the subpoenas calling for those records until the Circuit Court should rule on plaintiffs' motion to quash the subpoenas and until the Supreme Court had passed upon the ruling of the

---

4. There was never any question that when Mrs. Tudor was subpoenaed, she had ceased to be an employee of the Party.

As of that time she was an employee in the office of Governor Rockefeller.

Circuit Court. However, the Supreme Court refused to stay its mandate in the case involving the Bank and so left the Bank under a duty to comply upon demand with the subpoena directed to it.

The situation just outlined was that which existed when this suit was filed in this Court in early October 1967. The position in which the Party found itself was anomalous; while it had protection as far as its own records were concerned, it had no protection with respect to the Bank's records, and, as indicated, if the Bank's records should be produced, the question of the availability of the Party's records would be moot.

In such circumstances plaintiffs upon filing their complaint in this Court applied to the single judge to whom the case was assigned to issue a temporary restraining order to protect the records of the Bank pendente lite. An immediate hearing on that application was held, at which hearing Mr. Mobley appeared pro se and also on behalf of Judge Roberts. The restraining order was issued and is still in effect.

The temporary restraining order in no way prohibited further proceedings in the Circuit Court of Faulkner County in connection with the motion to quash pending in that Court, and in January of the current year counsel on both sides were specifically so advised.

Had there been further proceedings in the State court, this Court might very well have been inclined to abstain at least temporarily from hearing and deciding this case in the hope that the State court litigation would either eliminate or clarify the federal questions presented here and at least some of which have been raised by the Party in its motion to quash filed in the Circuit Court.

■■ However, no further proceedings have been had in the State court and none seem to be contemplated in advance of our decision. Counsel on both sides appear to be content to have this Court proceed to judgment herein. In view of that fact, and in view of the lapse of time which has transpired already and of the desirability of having the issues between the parties disposed of promptly, we conclude that abstention is neither required nor appropriate. We hasten to add, however, that we feel that in general controversies about Act 160 subpoenas should be litigated in the first instance in the courts of Arkansas.

What has just been said about abstention leads us to take up, before any discussion of the merits, the claim of the defendant that plaintiffs could have participated in the State court litigation which has been described and could have raised in that litigation the federal constitutional questions which they seek to raise here, and that plaintiffs are bound on principles of res judicata by the decision in First National Bank v. Roberts, supra, and possibly by the decision in Tudor v. Roberts, supra, although we do not see that the Tudor decision really has much significance here as far as res judicata is concerned. It is obvious that the Gill decision is not relevant here on the res judicata issue.

We reject the res judicata contention. The subpoenas involved in the Bank's case and in the Tudor case were not directed to the Party or its officials. It is evident that the Party was aware of those subpoenas, and it might have sought and obtained leave to intervene in the litigation involving them. Had it done so and submitted to the State courts the federal questions which it tenders here, it might well have been bound by the State court adjudications. England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440.

■■ However, a litigant with a federal claim ordinarily has a right to have that claim litigated in the federal courts. England v. Louisiana State Board, supra; Willcox v. Consolidated Gas Co., 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382; Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150. And we do not think that plaintiffs were required to go into the State courts merely because they might have done so.

As has been seen, the Tudor case was disposed of on nonconstitutional grounds. Some constitutional contentions were advanced by the Bank on its own behalf, but a reading of the decision in the Bank's case makes it clear that those grounds were not the same as those advanced by plaintiffs in this action.

Coming now to the merits, the position of the plaintiffs, insofar as we find it necessary to state it, is that the Arkansas statute, facially and in application, is violative of the First and Fourth Amendments to the Constitution of the United States, as both of those amendments are incorporated into the Fourteenth Amendment.

■■ We do not accept the claim that Act 160 of 1937 is unconstitutional on its face. As noted, its purpose was to implement Amendment 21 to the Constitution of Arkansas and to place in the hands of the prosecuting attorneys the investigative and subpoena powers formerly exercised exclusively by grand juries. No one can contend seriously today that such powers cannot validly be conferred on administrative officers or agencies; the Congress and State legislatures have done so many times, and, subject to certain limitations to be mentioned, the validity of such legislation has been upheld regularly. 1 Davis, Administrative Law Treatise, Chapter 3; Civil Aeronautics Board v. Hermann, 353 U.S. 322, 77 S.Ct. 804, 1 L.Ed.2d 852; United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401; Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L. Ed. 614; Adams v. Federal Trade Commission, 8 Cir., 296 F.2d 861.[5]

Plaintiffs' attack on the facial constitutionality of the statute would appear to boil down to the contention that the statute is too broad, that it does not in any manner limit or circumscribe the scope of the subpoenas which prosecuting attorneys may issue, and that it affords to subpoenaed persons no judicial remedy whereby they may litigate in advance the validity of the subpoenas served upon them.

■■ We take the Arkansas statute as it has been construed by the Supreme Court of Arkansas, and we are persuaded that the decisions of that Court in this overall controversy demonstrate that the power conferred by Act 160 is not unlimited; that the statute will be strictly construed; and that a person served with a subpoena duces tecum issued under Act 160 has access to the appropriate Circuit Court and thence to the Supreme Court of Arkansas to test the validity of the writ and to obtain protection against enforcement of a subpoena which calls for the production of irrelevant material or which contains an unreasonably broad or unduly burdensome demand for production of documents. Indeed, as we have seen, the Party has already obtained at least a measure of protection against enforcement of the subpoenas calling for the production of its own bank records.

■ Coming now to the question of the constitutionality of the statute in its attempted application to the records in question in this case, it may be conceded that in the present day the power of government, whether federal or State, to use the subpoena power in connection with investigations of suspected law violations is a broad one, and is particularly so where the subpoena is directed to an association, whether incorporated or unincorporated, as opposed to a private individual. As stated in United States v. Morton Salt Co., supra, 338 U.S. at 651–652, 70 S.Ct. at 368:

"The Commission's order is criticized upon grounds that the order trans-

---

**5.** We find it convenient to say at this point that although plaintiffs argue to the contrary, we assume for present purposes that Act 160 authorizes the issuance of investigative subpoenas in advance of the filing of criminal charges; that a prosecuting attorney may issue a subpoena duces tecum, as well as an ordinary subpoena; that the particular subpoenas here involved meet the formal requirements of the Arkansas statute; and that an Act 160 subpoena need not be accompanied by a bill of particulars.

gresses the Fourth Amendment's proscription of unreasonable searches and seizures and the Fifth Amendment's due process of law clause.

"It is unnecessary here to examine the question of whether a corporation is entitled to the protection of the Fourth Amendment. Cf. Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614. Although the 'right to be let alone— the most comprehensive of rights and the right most valued by civilized men,' Brandeis, J., dissenting in Olmstead v. United States, 277 U.S. 438, 471, at 478, 48 S.Ct. 564, 72 L.Ed. 944, is not confined literally to searches and seizures as such, but extends as well to the orderly taking under compulsion of process, Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, Hale v. Henkel, 201 U.S. 43, 70, 26 S.Ct. 370, 50 L.Ed. 652, neither incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret. Hale v. Henkel, supra; United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542.

"While they may and should have protection from unlawful demands made in the name of public investigation, cf. Federal Trade Comm'n v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, corporations can claim no equality with individuals in the enjoyment of a right to privacy. Cf. United States v. White, supra. * * * "

■ On the other hand, the use of the subpoena power must not be unreasonable or fundamentally unfair. Generally speaking the test of the validity and enforceability of an administrative subpoena is threefold: (1) Did the officer or agency act within its jurisdiction in issuing the subpoena? (2) Is the subpoena sufficiently specific with respect to the materials sought to be disclosed? (3) Is the information or data sought "reasonably relevant" to the end which the investigating officer or agency

is seeking to achieve? United States v. Morton Salt Co., Oklahoma Press Publishing Co. v. Walling, and Adams v. Federal Trade Commission, all supra.

■ Although as pointed out in *Morton Salt*, supra, "neither incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret," and although corporations cannot claim "equality with individuals in the enjoyment of a right to privacy," recent Supreme Court decisions establish that an organization made up of private individuals has standing to protect those individuals from unwarranted invasions by government of their rights of association and privacy guaranteed by the First and Fourteenth Amendments. Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929; Louisiana ex rel. Gremillion, Attorney General v. NAACP, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301; Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231; Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480; NAACP v. Alabama ex rel. Patterson, Attorney General, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488.

■ The rationale of those decisions is that the First and Fourteenth Amendments protect the rights of people to associate together to advocate and promote legitimate, albeit controversial, political, social, or economic action; that when the objective of the group or the group itself is unpopular at a given time or place, revelation of the identities of those who have joined themselves together or have affiliated with the group may provoke reprisals from those opposed to the group or its objectives; and that the occurrence or apprehension of such reprisals tends to discourage the exercise of the rights which the Constitution protects. In such circumstances, disclosure of the identities of members of the group can be compelled only by showing that there is a rational connection between such disclosure and a legitimate governmental end, and that the govern-

mental interest in the disclosure is cogent and compelling.

Moreover, even if a State can legitimately compel a limited disclosure of individuals affiliated with a group, it does not follow that the State can compel a sweeping and indiscriminate identification of all of the members of the group in excess of the State's legitimate need for information. As stated in Shelton v. Tucker, supra, 364 U.S. at 488, 81 S.Ct. at 252:

"* * * (E)ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of * * * abridgment must be viewed in the light of less drastic means for achieving the same basic purpose."

The principles which have been stated above are general ones, and our decisional task is to apply them to the controversy at hand, confining ourselves, of course, to the facts and circumstances of this particular case. Our ultimate finding and conclusion is that to compel at this time the disclosure of the identities of contributors to the 1966 Republican campaign fund and the amounts of the individual contributions would be violative of federally protected rights of the Party and its contributors and should be enjoined.

In making that finding and conclusion we do not question the right or duty of Mr. Mobley to investigate reports of election law violations. Nor do we suggest that the financial records of political parties are completely immune from public disclosure where such disclosure is relevant to the achievement of a legitimate State end, and where the public interest in disclosure is sufficiently cogent and compelling to outweigh the interest of the party and its members in the nondisclosure of the information.

The basis of our decision is that there is no showing here that the identities of Party contributors and the amounts of their contributions are reasonably relevant to defendant's investigation of alleged vote buying or that the public interest, if any, in the disclosure of that information is sufficiently cogent and compelling to outweigh the legitimate and constitutionally protected interests of the Party and its contributors in having that information remain private.

In an investigation of vote buying the investigator needs to know whether votes were bought, whose votes were bought, and who did the buying. The existence of a rational connection between a list of contributors to a political campaign fund and the object of an investigation of this kind implies the proposition that knowledge of contributor identity will lead to knowledge of whether, to what extent, and by whom the contributed funds were unlawfully spent.

It is obvious that the proposition just stated would not be valid in all cases and no showing has been made as to its validity in this case. Even if it be conceded that defendant's investigation might be advanced if he knew that certain individuals had made contributions to the Tudor account, we do not think that that fact would make relevant the disclosure of all of the contributors and the amounts of all of the contributions. It has never been suggested that all or a substantial number of the contributors made their contributions with the end in view of having their money spent to violate the election laws, and the Court cannot presume that they did so.

We recognize that investigators today may have more latitude in conducting investigations than they had when Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, was decided in 1924. See United States v. Morton Salt Co., supra, 338 U.S. at 652, 70 S.Ct. 357. But, that latitude does not extend so far as to permit impingement on associational rights of people on the mere suspicion that the information sought may constitute or lead to evidence that some of the people

concerned, or others, have violated State election laws.

▇▇ The Alabama, Arkansas, Florida, and Louisiana First Amendment cases which have been cited make it clear that the First Amendment protects freedom of association and privacy of association. It also protects freedom to participate in political life without unjustified governmental interference.

While there is no evidence of record in this case that any individuals have as yet been subjected to reprisals on account of the contributions in question, it would be naive not to recognize that the disclosure of the identities of contributors to campaign funds would subject at least some of them to potential economic or political reprisals of greater or lesser severity.

Apart from fear of actual reprisal, many people doubtless would prefer not to have their political party affiliations and their campaign contributions disclosed publicly or subjected to the possibility of disclosure merely because an officer or agency clothed with investigatory powers may suspect that some members of their party may have violated the law. Disclosure or threat of disclosure well may tend to discourage both membership and contributions thus producing financial and political injury to the party affected.

Whether we like it or not, political parties have to have money and members, and anything which deters people from party support is detrimental to the party involved, regardless of what party it is. And the potential detriment to be apprehended from an unjustified disclosure of member and contributor identities would appear to bear particularly heavily upon a party, like the Republican Party in Arkansas, which for many years was and still is a minority party as far as numbers of regular adherents are concerned, and which in only recent years has been able to enter upon what appears to be a period of rejuvenation and growth.

Along with the injury which unjustified disclosures of the type here involved may inflict upon the affected party as a political organization, it is recognized that such disclosures injure individual party members and contributors as well. For various reasons, including fear of reprisal or harassment, the possibility of disclosure of their party affiliations and contributions, if any, tends to inhibit citizens from exercising their right to participate meaningfully in American political life.

It may be said that although it may be far from perfect the political party system, as it has developed and operates in this country, is vital to our democratic processes. For better or for worse, the only means, apart from voting, whereby most people can participate effectively in politics is to affiliate themselves with a political party and to make financial contributions thereto according to their respective means and inclinations. To the extent that a public agency or officer unreasonably inhibits or discourages the exercise by individuals of their right to associate with others of the same political persuasion in the advocacy of principles and candidates of which and of whom they approve, and to support those principles and candidates with their money if they choose to do so, that agency or officer violates private rights protected by the First Amendment.

Regardless of the extent to which the Fourth Amendment may be applicable to this case, we think that the First Amendment dictates that the disclosure of the data about contributors and individual contributions sought by defendant be enjoined. We think that in order to overcome the prohibitions of that Amendment the defendant was required to make a far greater showing of relevancy and public interest in the disclosure than has been made here.

We do not say that a State may never determine as a matter of public policy that data as to campaign contributions should be made public and incorporate that determination into positive legislation such as the Federal Corrupt Prac-

tices Act, 2 U.S.C.A. § 241 et seq.[6] Indeed there may be much merit in legislation of general application which requires public disclosure of contributions and contributors. But a requirement expressed in a statute of general application and of the existence of which the public is charged with knowledge is quite different from a requirement made ex parte by a prosecuting officer, particularly where the demand has no more substantial basis than the one involved in this case.

We have pointed out that the records of the Bank and the records of the Party reflect essentially the same information. There is this difference between the two sets of records, however: the records of the Bank are the property of the Bank and within the control of the Bank; the records of the Party are the property of the Party and are within the control of the Party.

■ It is not contended by either the plaintiffs or the Bank that the latter has any privilege not to disclose its own records of the Tudor account. And ordinarily a depositor does not have any standing to prevent a bank from producing bank records of his account in obedience to a subpoena. DeMasters v. Arend, 9 Cir., 313 F.2d 79; Foster v. United States, 2 Cir., 265 F.2d 183; Kilgore National Bank v. Federal Petroleum Board, supra; Zimmermann v. Wilson, 3 Cir., 105 F.2d 583.

■ This, however, is not an ordinary case. Apart from any right of the Party, as such, to have the information in question protected, individual contributors have the right to remain anonymous. They cannot assert that right themselves without defeating their own purpose; if a party cannot protect the Bank records in the interest of the individual contributors, their right to privacy is nullified. In the circumstances we think that the plaintiffs have standing to prevent the disclosure of the Bank

records. Cf. NAACP v. Alabama, supra, 357 U.S. at 459, 78 S.Ct. 1163.

As above indicated, we limit the relief which we grant in this case to such of the records of the Party and of the Bank as would reveal the names of contributors to the Party whose contributions went into the Tudor account and the amounts of individual contributions. In this connection it appears to us that the main thrust of plaintiffs' action has been to protect the records of individual contributions rather than to prevent disclosure of expenditures. In fact, the Party has already supplied defendant with photostats of all checks drawn in favor of persons residing in the Fifth Judicial Circuit, and it might be willing to give him additional information.

The subpoenas in controversy, as drawn, seek to compel disclosure of all of the records of the Tudor account. Enforcement of those particular subpoenas will be enjoined and further efforts on the part of the defendant to compel disclosure of information as to individual contributions will also be enjoined. If petitioner desires to seek the production of other material reflected by the records of the Tudor account, he may issue new subpoenas duces tecum and should undertake to state therein with some specificity the material which he desires. The propriety of any new subpoenas may well be tested by means of motions to quash filed in the Circuit Court.

If the defendant proceeds with his investigation, and if he finds himself in a position to make a showing which under the constitutional principles which have been mentioned would entitle him to see records pertaining to the contributions of certain particular individuals, he can apply to this Court for an appropriate modification of this decree as provided by Rule 60(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. See also United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999; United

6. Arkansas has never seen fit to make a requirement for publication of individual contributions although ever since 1913 at least some disclosure of political expenditures by candidates has been required. See Ark.Stats.Ann., §§ 3–1308 and 3–1312.

States v. Little Rock Packing Co., E.D. Ark., 104 F.Supp. 527, aff'd 8 Cir., 202 F.2d 234.

As noted, Circuit Judge Roberts and the Bank have been named as parties defendant. It is not to be supposed that the former will take any independent steps to enforce the subpoenas, and we see no occasion for enjoining him. As to the Bank, it has not up to this time been willing to divulge its records voluntarily to Prosecutor Mobley, and there is no real reason to believe that it will change its position. However, for the Bank's own protection as much as anything else, it will be included in the injunction.