LOCAL 1814, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Political Action and Education Fund, on behalf of itself and certain contributors, and Local 1814, International Longshoremen's Association, AFL–CIO, on behalf of some of its members, Plaintiffs,

v.

The WATERFRONT COMMISSION OF NEW YORK HARBOR and New York Shipping Association, Inc., Defendants.

80 Civ. 4211–CLB.

United States District Court, S. D. New York.

April 7, 1981.

Schulman & Abarbanel by James M. Altman, New York City, for plaintiffs.

Waterfront Commission of N. Y. Harbor by David B. Greenfield and Robert A. Pin, New York City, for defendants.

Lorenz, Finn, Giardino & Lambos by William M. Spelman, New York City, for N. Y. Shipping Ass'n.

BRIEANT, District Judge.

Plaintiffs (hereinafter sometimes collectively referred to as the "Union" or "Local 1814") commenced this action on July 23, 1980 seeking preliminary and permanent injunctive relief to prevent the defendant Waterfront Commission, from enforcing a subpoena issued to the co-defendant, New York Shipping Association, in connection with an investigation to determine whether longshoremen union members were being coerced by union leadership or unknown persons, into authorizing payroll deductions for the benefit of the Local 1814, International Longshoremen's Association, AFL–CIO, Political Action and Education Fund (hereinafter the "Fund"). Plaintiff Local 1814 is a collective bargaining organization representing longshoremen working in the Port of New York. It helped to organize the Fund, its co-plaintiff, and currently administers and solicits contributions to the Fund. The Fund in turn makes contributions and expenditures in connection with federal and state elections for the benefit of candidates friendly to the Union.

The New York Shipping Association represents the employers of waterfront labor in the negotiation and administration of collective bargaining agreements. Local 1814 arranged for the Association to deduct ¼ of 1% of gross earnings for the Fund from the payroll check of each longshoreman who signed an authorization or check-off form. The Association withholds these contributions from the pay of union members, and remits directly to the Fund.

The original subpoena sought disclosure of the names of the approximately 3,350 longshoremen who had signed these authorization forms. As currently amended, the subpoena seeks the production of "[a] list of all longshoremen who signed said assignment forms for the benefit of Local 1814 Political Action and Education Fund since January 1, 1979," the effective date of the authorization forms. The number of longshoremen whose names would be subject to disclosure is approximately 450.

After a hearing on July 29, 1980, this Court by Order enjoined the enforcement of the subpoena, and any other attempt by the Waterfront Commission to obtain by indirection the information sought in the subpoena. See Stipulation for Consent Order. A trial of the merits was held on October 16, 1980. Decision was reserved, and the post-trial submissions of the parties have been received and considered.

The Waterfront Commission furnished the Court *in camera* with copies of its agency reports and recorded testimony of witnesses taken in connection with this investigation; redacted versions of most documents were furnished to plaintiffs. Aside from the details of the investigation, the basic facts were stipulated by the parties (Joint Stipulation of Facts).

■ An administrative subpoena will be sustained generally if the inquiry is within the authority of the requesting agency, the demand for documents is not too indefinite, and the information sought is reasonably relevant to the inquiry. *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1952).

■ The Waterfront Commission was established with the consent of Congress pursuant to a Compact between the State of New York and the State of New Jersey. The Compact established a comprehensive plan to regulate the New York waterfront. Among its stated purposes was the elimination of depressing and degrading labor conditions, corrupt hiring practices and criminal activity. *Connolly v. O'Malley,* 17 A.D.2d 411, 234 N.Y.S.2d 889 (1st Dept. 1962). In order to achieve these objectives, the Commission has the statutory power "[t]o make investigations, collect and compile information concerning waterfront practices," and in connection therewith to issue subpoenas to compel the attendance of witnesses and the production of documents. New York Unconsolidated Laws § 9810(11) and (8) (McKinney's 1974). The present inquiry into whether the Union is obtaining authorization forms by the use of coercion of its members clearly falls within the investigative authority of the Waterfront Commission.

The plaintiffs argue that because no first-hand evidence of the actual initiation of an investigation into coercion in solicitation of the authorization forms was presented, the Commission has not demonstrated its statutory power to issue the subpoena. Although the plaintiffs are correct that no direct testimony was presented to show that an investigation was officially commenced, there was sufficient evidence to support the conclusion that the subpoena was within the Commission's statutory authority. The subpoena indicates on its face that it was issued in connection with an investigation of waterfront practices and conditions. The evidence presented established the details of the investigation being conducted into possible coercion in connection with the solicitation of authorization forms. This investigation is clearly within the statutory purpose of the Commission to eliminate corrupt labor practices on the waterfront. The subpoena was issued by an interstate governmental agency. The agency reports and interview transcripts provided to the Court establish that an investigation as described was actually being conducted and, in fact, that it was initiated as a response to apparently genuine complaints of coercion received from longshoremen.

In the absence of contrary evidence, the Court finds that the subpoena was issued in connection with a legitimate investigation within the statutory authority of the Commission.

The request for the names of the longshoremen who signed the authorization forms after January 1, 1979 is sufficiently clear and explicit. There are 450 longshoremen who signed forms authorizing deductions for the benefit of the Fund. These names should be readily accessible to the Association. The authorization forms were provided to the Association so that contributions could be deducted automatically from the payroll checks of the longshoremen. The Association administers the payrolls for its member employers of Local 1814 members.

The list of names requested in the subpoena is also reasonably relevant to the investigation. What the Waterfront Commission seeks to obtain is a list of possible victims of coercion. The list of the names of the longshoremen who signed the authorization forms after the effective date, requested in the amended subpoena, could be inferred to be the least enthusiastic of the contributing union members and the most likely group to have been coerced. Discovering the names of these persons with an aim to subsequent interviews is relevant to an inquiry into whether coercion existed and who the actors were, and whether the coercion, if any, was wide-spread or confined to a few solicitors. The Court finds therefore that the names requested are reasonably relevant to the purposes of the investigation.

Plaintiffs have raised the possibility of an additional requirement that the Waterfront Commission must meet to satisfy the statutory requirements. They contend that New York law is applicable and that the New York courts have required a preliminary showing of some factual basis for the investigation before a subpoena may be enforced. The rationale of two New York cases cited by plaintiffs is that some basis must be demonstrated in support of broad, sweeping subpoenas, in order to prevent investigative authority from becoming "[potential] instruments of abuse and harassment." *Myerson v. Lentini Brothers Moving & Storage Co.*, 33 N.Y.2d 250, 257, 351 N.Y.S.2d 687, 306 N.E.2d 804 (1973); *accord, Nicholson v. State Commission on Judicial Conduct*, 67 A.D.2d 649, 412 N.Y.S.2d 602 (1st Dept. 1979).

■ This Court doubts that an administrative subpoena issued by the Waterfront Commission, which was created pursuant to an interstate compact, must be evaluated in accordance with state rather than federal law. *Cf., Bell v. Waterfront Commission of N. Y. Harbor*, 20 N.Y.2d 54, 61, 281 N.Y. S.2d 753, 228 N.E.2d 758 (1967) (constitutionality of the statute to be determined according to federal law). However, assuming New York law to be applicable, the

cases relied upon by plaintiffs are not in point. These cases required a factual showing to guard against abuse when an exceptionally broad subpoena was issued. In this case, the subpoena which seeks to obtain the names of possible victims of coercion or extortion is not so broad that absent specific evidence, one could conclude that the Commission was conducting a fishing expedition to harass the Local or its members. Also, and in any event, the Commission has made a sufficient factual showing. Complaints received by the Waterfront Commission from six longshoremen recounted similar experiences. Their testimony was corroborated by accounts of what the general understanding was among the longshoremen as to the necessity of authorizing payroll deductions for the benefit of the Fund in order to obtain full benefits of the duty of fair representation owed them by the Union. Although the limited evidence obtained thus far by the Commission surely is not conclusive, and probably does not constitute probable cause to believe coercion has occurred, it does provide a sufficient basis for a continuing investigation, and suggests that the subpoena is issued in good faith.

 Although I find there is a sufficient statutory basis to enforce the subpoena, our inquiry does not end there. Local 1814 has asserted that disclosure of the names requested in the subpoena would have a chilling effect on its members' rights of privacy and free association guaranteed by the First and Fourteenth Amendments to the United States Constitution. If plaintiffs demonstrate that disclosure as sought would infringe the First Amendment rights of its members to a significant extent, the Commission must then demonstrate a compelling state interest sufficient to outweigh the infringement of these rights. *See, Matter of Wood*, 430 F.Supp. 41, 45 (S.D.N.Y. 1977); *Pollard v. Roberts*, 283 F.Supp. 248, 257–58 (E.D.Ark.), *aff'd*, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968). Plaintiffs must demonstrate that enforcement of the subpoena would have a chilling effect on the First Amendment rights of the members. Among the rights protected by the

First Amendment is the right of persons to join together for effective advocacy to promote their common ideas. *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The First Amendment also protects the right of contributors to join together and pool their resources to promote their political beliefs. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Supreme Court in *Buckley* seems to have recognized that as has been said, "Money is the mother's milk of politics." Accordingly, the right to join together to pool political contributions is an integral part of the right to associate for effective advocacy.

"As we have seen, group association is protected because it enhances '[e]ffective advocacy.' *NAACP v. Alabama, supra* [357 U.S.] at 460 [78 S.Ct. at 1170]. The right to join together 'for the advancement of beliefs and ideas,' *ibid.*, is diluted if it does not include the right to pool money through contributions, for funds are often essential if 'advocacy' is to be truly or optimally 'effective.' Moreover, the invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations, for '[f]inancial transactions can reveal much about a person's activities, associations, and beliefs.' *California Bankers Assn. v. Shultz*, 416 U.S. 21, 78–79 [94 S.Ct. 1494, 1525–1526, 39 L.Ed.2d 812] (1974) (Powell, J., concurring). Our past decisions have not drawn fine lines between contributors and members but have treated them interchangeably." 424 U.S. at 65–66, 96 S.Ct. at 657.

Plaintiffs have also established clearly that the disclosure of all these contributors' names is likely to have a chilling effect on the exercise of the union members' First Amendment rights. Although defendant's argument emphasizes that the potential interviewees are targeted as victims, rather than perpetrators of any wrongdoing, and that there is no evidence of any intent to visit reprisals against longshoremen because they are members of the Union or contrib-

ute to the Fund, these arguments are not persuasive in light of the unusual factual situation of this case. *See, Pollard v. Roberts, supra*, 283 F.Supp. at 256.

Both parties recognize the pervasive degree of control potentially exercised over waterfront labor by the Waterfront Commission. It supervises the harbor workers' registration for employment and determines their eligibility for work. No person is eligible to work as a longshoreman on the New York waterfront unless he is registered, and the Commission in its discretion has the power to remove any employee from that register, temporarily or permanently. New York Unconsolidated Laws §§ 9827, 9831 and 9913. Failure to answer questions truthfully or to produce requested information in an investigation would be grounds for revocation of registration. *Id.* § 9913(5). An interview of contributors will inevitably follow compliance with the subpoena.

In light of the broad powers granted to the Commission to investigate crime on the waterfront, the Court finds compelling the conclusion that the named persons would believe reasonably that dire consequences would result, whether they submitted or declined to be interviewed. This Court believes the longshoremen would be apprehensive about being interviewed by the Commission, and would prefer to exercise their First Amendment rights to join together to make political contributions in private. Compelled disclosure would have a chilling effect on their exercise of those rights.

The Waterfront Commission has shown a compelling state interest in investigating and suppressing criminal conduct on the waterfront. It was organized for this very purpose, and in recognition of a perceived need for some regulation to find and eliminate crime. The statute establishing the Waterfront Commission specifically recounts many of the evils which the States of New York and New Jersey had found to exist and which were concluded to be "a direct encouragement of crime." New York Unconsolidated Laws § 9802. Although the working conditions on the waterfront have improved considerably since 1953 when the Commission was established, crime there, as elsewhere in our society, continues unabated. Neither this Union nor its officers, nor this Court are ignorant of existing conditions on the piers. *See, e. g., United States v. Scotto*, 641 F.2d 47 (2d Cir. 1980); *United States v. Clemente*, 494 F.Supp. 1310 (S.D.N.Y.1980), *aff'd.*, 640 F.2d 1069 (2d Cir. 1981). It is clearly in the public interest to eliminate coercion, if it exists, in the exercise of the longshoremen's political rights or their rights as union members. *See, Branzburg v. Hayes*, 408 U.S. 665, 700, 92 S.Ct. 2646, 2666, 33 L.Ed.2d 626 (1972).

In a case such as this, when a non-frivolous claim has been asserted that compelled disclosure would infringe substantially on First Amendment rights, the Court must weigh the competing interests, and determine whether the compelled disclosure is permissible. *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 545, 83 S.Ct. 889, 893, 9 L.Ed.2d 929 (1963); *Schneider v. State*, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939). The governmental interest in obtaining the information sought must survive exacting scrutiny. A demonstration that the state interest in conducting an investigation is compelling is alone insufficient to establish that a particular subpoena issued in connection with that investigation should be upheld.

> "The fact that the general scope of the inquiry is authorized and permissible does not compel the conclusion that the investigatory body is free to inquire into or demand all forms of information. Validation of the broad subject matter under investigation does not necessarily carry with it automatic and wholesale validation of all individual questions, subpoenas, and documentary demands." *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 545, 83 S.Ct. 889, 893, 9 L.Ed.2d 929 (1963).

There must be a "relevant correlation" or "substantial relation" between the information to be disclosed and that governmental

interest. *Buckley v. Valeo, supra; NAACP v. Alabama, supra; Bates v. Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). As discussed previously in this decision, the Commission has demonstrated that there is a reasonable and substantial relation between the information sought and the state interest in fighting crime on the waterfront. Discovery of the names of alleged victims, followed by their interview, would lead logically to information about the coercion or conversely to refutation of the allegation that coercion was a widespread practice.

In balancing these competing claims the Court is mindful that the victims of the criminal conduct alleged are among the very same persons whose Constitutional rights would be infringed if the subpoena were enforced. The need for protection of the First Amendment rights of some Union members should not produce as a consequence, the shielding of wrongdoing on the part of other members from lawful investigation and disclosure. The public interest in eliminating such criminal conduct, if it does exist, would justify *some* infringement on the First Amendment rights of the "potential victims." There is no reason to think that every contributor gave as a result of coercion. The Commission must, therefore, employ the least restrictive method of obtaining the information it needs.

▮ As the Supreme Court stated in *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960):

> "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." [Footnotes omitted].

In the conduct of its investigation to date, restricted as it was by the preliminary injunction issued herein, the Commission has succeeded in interviewing several complainants and/or informants. These persons in turn have put Commission investigators in communication with several additional persons from whom the Commission has received more information. The Commission conceded that it could publicize its inquiry, and indeed avers (Post Trial Brief, p. 7) that it has already "put the word out on the street" that Commission investigators were interested in talking to any longshoreman who believed that he had been coerced into authorizing payroll deductions for the Fund. As the Commission's brief notes "this produced the expected negligible grist; volunteers are as numerous on the waterfront as they are in the infantry." It is not clear to the Court, however, that publicity as a means for obtaining confidential information has been exhausted. Conceivably anonymous informants could be solicited by public announcement, and the recent criminal convictions of Local 1814 leaders, cited *supra,* may have eased the moral pressure within the Union against informing.

Plaintiffs have suggested that interviews of those contributors whose names are already public, that is, those who have authorized contributions in excess of $99.00 per year, should be a first step. By authorizing $99.00 or more to be withheld, a donor is on notice that his name will be public. Interviewing these donors would seem to be of doubtful utility because the contributors of higher amounts would likely be those who are more successful earners on the docks, and who perceived contributing as being worthwhile in itself, as it probably is. These persons need not be coerced. An evaluation of recent history suggests that the Union has benefited from its political effort both in providing volunteer political workers to carry petitions or to campaign, and in money gifts to candidates. Undoubtedly this effort has been helpful to the members' long term interest, and of course, highly beneficial to the Union leaders.

It is also a possible less intrusive alternative that the persons suspected of having done the coercion could be interviewed, or required to testify pursuant to subpoena.

This Court is convinced that less intrusive means for forwarding this investigation would be as effective as the proposed subpoena. Accordingly, the Court will adjudge that the subpoena be vacated without prejudice to pursuit by the Commission of its legitimate investigation by less intrusive means.

It is important to avoid repetitious litigation. At the same time it is not the function of this Court to run the investigation, unless to do so would represent the last resort for protecting First Amendment rights of vital importance. Accordingly, the first move toward a less intrusive procedure should be made by counsel for the respective parties. Counsel for the parties are directed to meet and hold an office conference within the next ten (10) days for the purpose of attempting, without prejudice to their rights asserted herein, to agree upon a less intrusive means for satisfying the legitimate needs of the Commission and at the same time having the least practical impingement upon the First Amendment rights of the members. If this meeting produces an agreement, this Court will enter a permanent injunction limiting the degree of intrusion in accordance with that agreement. If, within the time allowed by the foregoing direction, the parties are unable to reach such an agreement, this Court will hold a further hearing, and following that hearing will impose a plan which the Court will find to be appropriate under all of the circumstances.

Within their discussions, counsel should consider the possibility of producing a representative random statistical sample of the names of the persons who authorized payroll withholding for political purposes in amounts *less* than $99.00 per year after January 1, 1979. An investigation of this representative random sample should produce sufficient evidence to prove a *prima facie* case of coercion, if the coercion in fact exists. Depending on the results, the parties could agree upon additional or further investigative procedures, or the Court should make a direction. However, the foregoing suggestion is offered solely to advance the discussions which the Court has directed to be held.

The Court will hold a final conference of counsel in the matter on April 22, 1981 at 4:00 P.M. in Courtroom 705 to receive the report of the progress of the discussions. After hearing counsel, the Court will make such other and further directions as may then appear to be necessary to give effect to the findings and conclusions after trial set forth above. Thereafter, a final judgment will be entered in this action.

So Ordered.