Titone, J.
(dissenting). I agree with the majority’s conclu *318 sion that the controversy presented on this appeal is not moot. I also agree that the Union membership’s Fourth Amendment rights have not been violated. Although I agree with my colleagues that there is a compelling State interest initially justifying disclosure of the Locals’ membership lists, we differ as to whether the subpoenas, as issued, were overbroad. Inasmuch as I find that the lower courts failed to properly balance the admittedly compelling governmental interest in disclosure against the First Amendment rights of the Union members, I would reverse and remit for a new hearing.
As a result of a New York County Grand Jury investigation into corruption in the carpentry and drywall industries, the District Attorney issued subpoenas duces tecum to four Locals of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO. Although the Union’s officials were the primary targets of the investigation, the subpoenas sought the entire membership lists of all four Locals, consisting of some 10,000 names, addresses, home telephone numbers and Social Security numbers. Contending that the broad disclosure requested by the District Attorney implicated the First Amendment rights of the membership, the Union sought to quash the subpoenas. Alternatively, the Union argued that the subpoenas were overbroad, and requested that the disclosure be limited to what was reasonably necessary to serve the legitimate needs of the investigation.
In issuing the subpoenas in an ex parte proceeding at which only the District Attorney’s office was represented, not one word was mentioned regarding the First Amendment rights of the Union membership. After the Union moved to quash the subpoenas on First Amendment grounds, the Supreme Court failed to indicate whether it had even considered the constitutional claim or balanced the conflicting rights of the government and the members of the Locals. Similarly, there is nothing in the record to indicate that the courts below carefully scrutinized the reasonableness of the District Attorney’s demands or considered the feasibility of less restrictive alternatives. Whether or not the Appellate Division considered the Locals’ constitutional claim is also unknown, since that court affirmed, without opinion.
What is known is that even the Assistant District Attorney admitted that not all of the names on the membership lists were necessary to the investigation. Nevertheless, the majority concludes that "the District Attorney’s continued posses *319 sion of the membership lists * * * does not violate the constitutional rights of the Union Locals or their members” (majority opn, at 310). This holding is contrary to the controlling Federal case law.
Although acknowledging the substantial First Amendment interest involved, the majority minimizes the significance of the arguments advanced by the Union in support of its position. The Locals do not merely contend that individuals may be deterred from joining the Union, and that members may be discouraged from engaging in Union activities. Rather, the Locals assert that forced disclosure of all 10,000 names, addresses, phone numbers and Social Security numbers of its members infringes on associational, and privacy rights by chilling the exercise of First Amendment rights of the rank- and-file. The Union points out that with its members’ Social Security numbers, the government now has access to the tax returns, financial and other personal information of each and every Union member. Fear of becoming visible may well cause some members to refrain from fully exercising their right to engage in the full range of Union activities, which include political as well as economic and social activities. With the entire membership’s home telephone numbers in his possession, the District Attorney may contact the rank-and-file at home any time he wishes. In sum, the Union’s position is that "the First Amendment protects one’s freedom of association, privacy and freedom to participate in a political life without unjustified governmental interference”. To further support its contention that disclosure here may adversely affect the Union, and thereby chill the exercise of constitutionally protected rights, the Locals point out the undisputed fact that newspapers have already reported on the investigation as a result of a news leak. These issues were explicitly raised below and again before this court in the Union’s brief, and, by implication, in the cases cited by the Locals.
A demand by the government that seeks to obtain constitutionally protected materials is subject to the most exacting scrutiny. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty’ assured by the Due Process Clause of the Fourteenth Amendment * * * Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny” *320 (N A. A. C. P. v Alabama, 357 US 449, 460-461). Regardless of how compelling the State interest may be, that interest must be balanced against the deterrent effect that the requested "disclosures may well have on the free exercise by [the locals’] members of their constitutionally protected right of association” (N. A. A. C. P. v Alabama, supra, at 463, citing Communications Assn. v Douds, 339 US 382, 400; see generally, Buckley v Valeo, 424 US 1, 25, 44-45). "Compelled disclosure is not permitted unless it is substantially related to a compelling governmental interest” (Local 1814, Intl. Longshoremen’s Assn. v Waterfront Commn., 667 F2d 267, 271, citing Buckley v Valeo, supra, at 64).
Nevertheless, the majority perceives no problem in requiring the Locals to turn over these membership lists and Social Security numbers because they believe that the Locals "have not demonstrated that organizational activity would be curtailed because of the delivery of the lists.” (Majority opn, at 314.) Even if we were to agree with this premise, we would still be compelled to dissent because this approach is contrary to the well-established constitutional principles enunciated in a long line of Federal cases (see, e.g., Buckley v Valeo, supra; Pollard v Roberts, 393 US 14 [Per Curiam], affg 283 F Supp 248; Shelter v Tucker, 364 US 479; Talley v California, 362 US 60; Bates v City of Little Rock, 361 US 516; N. A. A. C. P. v Alabama, 357 US 449, supra; Local 1814, Intl. Longshoremen’s Assn. v Waterfront Commn., 667 F2d 267, supra). Once it was determined that First Amendment rights were implicated here, the governing Federal precedents required that the burden shift to the government to show that there was a compelling State interest. The District Attorney also had to show that there was no less restrictive intrusion into the Union’s records that would reasonably satisfy the needs of the investigation. We were obligated to balance the conflicting interests of the Union and the government and perform the most exacting scrutiny regarding the People’s disclosure demand.*
*321 Although the majority attempts to distinguish the cases relied on by the Locals, the facts presented here fall squarely within the dictates of those cases. Indeed, the facts of this case are closely analogous to those of Local 1814, Intl. Longshoremen’s Assn. v Waterfront Commn. (supra). In Waterfront, the government sought disclosure of approximately 450 names of Union members who contributed to the Union’s political fund during a specified period of time as part of an investigation into corruption. The court denied such broad disclosure, and restricted the governmental access to only 10% of the names originally sought, finding that this would "limit the impairment of longshoremen’s First Amendment rights without compromising the Commission’s legitimate investigative needs” (Local 1814, Intl. Longshoremen’s Assn. v Waterfront Commn., supra, at 274). Were the same sort of scrutiny applied here, it is likely, given the record before us, that the requested disclosure would have been similarly limited.
The majority distinguishes the Waterfront case on the ground that it involved political speech. This implies that First Amendment rights were actually somehow capable of being prioritized into some descending order of importance. Federal law dictates otherwise. All fully protected First Amendment rights — whether involving association, privacy, speech, religion, or economics — are entitled to the identical protection and strict scrutiny that political speech enjoys (see, N. A. A. C. P. v Alabama, supra; Local 1814, Intl. Longshoremen’s Assn. v Waterfront Commn., supra). Further, the Locals do indeed argue that the free exercise of the rank-and-file’s political rights are being violated insofar as these rights are intimately bound up with participating in the political activities of the Locals.
More importantly, the initial inquiry is not on the specific First Amendment rights asserted. Rather, the court must inquire into whether the disclosure requested by the government "is substantially related to a compelling governmental *322 interest” (Local 1814, Intl. Longshoremen’s Assn. v Waterfront Commn., supra, at 271). Once it is ascertained that First Amendment rights are implicated, the burden shifts to the government to justify the legally compelled disclosure.
The majority further attempts to distinguish Waterfront on the ground that the requesting governmental body actually had access to the names and addresses of the longshoremen from another source, thereby minimizing the government’s need for the disclosure, while here, the information was not readily available. This argument, however, cuts both ways. Before the judiciary permits compelled disclosure of personal information that is otherwise difficult to obtain, it has an obligation to strictly scrutinize the reasonableness of such a request. But in any event, this was at most a minor factor in the Waterfront decision. Before considering the availability of the information from public sources, we are first obligated to scrutinize the District Attorney’s demands.
There is, however, a valid ground upon which to distinguish the instant case from Waterfront that mandates reversal. In Waterfront, the government sought some 450 members names, all of which had some direct relevance to the investigation. In this case, the government sought some 10,000 names and addresses, as well as home phone numbers and Social Security numbers, even though the government itself admitted that not all the information was relevant to the investigation. Further, as the majority aptly points out, in Waterfront, the disclosure sought was limited. The criteria used to determine whether a member’s name had to be disclosed was predicated on whether the Union member signed a political contribution card after a specific date. In our case, however, the District Attorney demanded the name of every Union member, regardless of which Local they belonged to, and regardless of whether the member was a potential source of relevant information who might shed some light on the investigation. In the instant case, there was absolutely no limiting criteria. Thus, every member whose involvement in the Union was politically motivated, as well as those members whose Union participation was economically or socially motivated, was demanded. In other words, the disclosure at issue here was far more intrusive than that presented in Waterfront.
Finally, the majority contends that "in this case * * * the District Attorney has established” during the in camera hearing "that a random selection of names would not adequately *323 serve the Grand Jury’s purpose.” (Majority opn, at 314-315.) We have reviewed the materials submitted to Justice Roberts, and two things become apparent. First, there was absolutely no showing that the First Amendment implications were even considered and it appears that no balancing at all was done before or after the subpoenas were issued. On this relatively barren record, we decline the invitation of the District Attorney to speculate as to whether or not the lower courts properly balanced the conflicting interests at issue.
Second, the Assistant District Attorney indicated to the issuing Magistrate that the primary target of the investigation was only one of the four Locals. Indeed, the District Attorney’s main justification for this sweeping disclosure was that to limit the subpoenas would immediately signal the suspected parties and jeopardize the investigation. This excuse is insufficient to warrant the full disclosure of the entire membership lists of all four Locals, since there were viable alternatives that could have been employed that would satisfy the reasonable needs of the investigation without infringing upon the First Amendment rights of the membership to such an intrusive degree. For example, the lists of names unrelated to the investigation could have been held by a neutral third party, as suggested by the Locals, disclosure could have been limited to a percentage of the total Union population, as was done in the Waterfront case. However, apparently, neither the majority nor the courts below even considered such reasonable alternatives. Indeed, no alternatives were considered.
Had the required balancing been done, and the requested disclosure been subjected to the demanding constitutional scrutiny required, it is inevitable that the broad disclosure demanded would have been significantly limited.
Accordingly, I would reverse and remit for a proper hearing.
Chief Judge Wachtler and Judges Kaye and Hancock, Jr., concur with Judge Simons; Judge Titone dissents and votes to reverse in a separate opinion in which Judges Alexander and Bellacosa concur.
Order affirmed, with costs.

 The majority points out that "the effect subpoenas have on the membership of a union and participation in its activities is quite different from the effect subpoenas may have on membership in a political group or participation in its activities. Because of the advantages of union membership and the need to discuss it for employment it is not generally concealed or denied.” However, we see a vast distinction between a union member voluntarily deciding to provide an employer with his Social Security number and union membership information, and the situation presented here, where *321 the State seeks to compel this disclosure. The former represents a freely made choice. The latter represents an intrusion by the government into the privacy rights of the individual, as well as implicating the associational rights of the members, since disclosure was demanded solely based on union membership. It is difficult to believe that the average union member would not regard a government demand for the names, home phone numbers and Social Security numbers of every member an intrusion into their privacy. Indeed, we contend that most people would be concerned when a governmental investigatory body demands such personal information.