## In re GRAND JURY PROCEEDING.

### No. 87–8041.

United States Court of Appeals,
Eleventh Circuit.

March 31, 1988.

William A. Cohan, Darold W. Killmer, Carl E. Stahl, Jennifer A. Greene, Cohan & Greene, P.C., Denver, Colo., Nicholas A. Lotito, Fierer & Westby, Atlanta, Ga., for appellant.

James E. Fagan, Jr., Asst. U.S. Atty., Atlanta, Ga., for appellee.

Before FAY and KRAVITCH, Circuit Judges, and ATKINS *, Senior District Judge.

KRAVITCH, Circuit Judge:

William and Carolyn Bicket, the National Commodity and Barter Association (NCBA), and the National Commodity Exchange (NCE) appeal from the district court's denial of their motion to quash a grand jury subpoena duces tecum issued to Les Roberts of Roberts & Roberts Brokerage, Inc. Because we conclude that neither the first nor the fourth amendment required the district court to quash the subpoena, we affirm.

I.

NCBA is an association dedicated to limited government, privacy in personal and financial affairs, and the protection of private property. NCBA advocates home education of children, the abolition of the Internal Revenue Service, and a return to the gold standard. It disputes the constitutionality of the Federal Reserve System and many of the federal administrative agencies. NCBA publishes books and newsletters alerting its members to the dangers posed by environmental pollution, unsound currency, and the growth of the federal government.

NCBA also provides its members with various financial services. For example, members can participate in a plan under which NCBA pays legal expenses for IRS audits and criminal tax prosecutions. Most importantly for purposes of this appeal, NCBA operates, through its wing NCE, a service through which members can purchase precious metals and pay bills with a minimum of recordkeeping. Under this plan, appellant William Bicket, the Atlanta area representative of NCBA, receives checks from members to be deposited in an "account" created for them by NCBA. Bicket collects the checks and forwards them to NCBA with forms in the nature of deposit slips. NCBA then disburses funds according to its members' instructions, without any indication that the disbursements are paid from any particular member's account.

Because its members have an aversion to paper currency, NCBA also arranges for their purchase of precious metals. Although NCBA usually writes checks for the commodities from the accounts that it operates for its members, in the transactions directly involved here, Bicket deviated from the customary plan. Bicket sent letters and checks bearing the members' names directly to Roberts & Roberts Brokerage, Inc., of Pensacola, Florida and instructed that brokerage firm to ship gold and silver directly to NCBA members. Roberts & Roberts thus holds records that identify the names and addresses of NCBA members.

The financial system operated by NCBA obviously provides significant opportunities for the evasion of federal tax laws, especially requirements for the reporting of taxable income. On September 15, 1986, a federal grand jury investigating possible criminal violations of the tax laws issued a subpoena duces tecum to Les Roberts, of Roberts & Roberts Brokerage, commanding the production of all records from January 1, 1983 to September 16, 1986 relating to NCBA, NCE, the Bickets, nine other individuals, and a trust. The Bickets, NCBA, and NCE moved in the district court to have the subpoena quashed, arguing that compliance would violate their first amendment right to freedom of expressive association. The movants also argued that the subpoena should be quashed as the fruit of an illegal search and seizure of NCBA's offices in Colorado. The district court denied the motion to quash, 650 F.Supp. 159, and this appeal followed.

II.

■ We consider first the appellants' fourth amendment argument. According to appellants, the district court should have quashed the subpoena because it was the

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

"fruit of the poisonous tree." In this case, the poisonous tree is a search and seizure at NCBA's Colorado offices that was held unconstitutional by the Tenth Circuit. *See Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir.1985). NCBA argues that the grand jury subpoena derives from information obtained in that search.

NCBA relies heavily on the venerable case of *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). In *Silverthorne Lumber*, the Supreme Court held that the government could not obtain by subpoena documents which federal marshals had previously seized in violation of the fourth amendment and which the district court had ordered returned to the owners. The Court rejected the government's argument that the fourth amendment prevented the government only from retaining physical possession over the documents, and not from using the information obtained in that search to its advantage. *See id.* at 391, 40 S.Ct. at 182.

The Supreme Court reexamined *Silverthorne Lumber* in *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Calandra sought to resist a grand jury subpoena requiring him to answer questions based on an allegedly unconstitutional search of his place of business. The Supreme Court rejected Calandra's argument that the exclusionary rule of the fourth amendment should be applied to grand jury proceedings. According to the Court, because of the special nature of grand jury proceedings, the grand jury "has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial." *Id.* at 349, 94 S.Ct. at 620. The Court assigned great weight to the "effective and expeditious discharge of the grand jury's duties," *id.* at 350, 94 S.Ct. at 621, and concluded that the suppression hearings required by the application of the exclusionary rule to grand jury proceedings would unduly impede and delay the grand

jury's function. *Id.* at 349–50, 94 S.Ct. at 621. The Court further noted that the issues raised in suppression hearings had been usually "reserved for trial on the merits," *id.* at 349, 94 S.Ct. at 621, and that grand jury use of the fruits of an illegal search would not necessarily prevent a criminal defendant actually under indictment from obtaining the suppression of those fruits at trial. *Id.* at 351, 94 S.Ct. at 621.

The *Calandra* Court considered the application of *Silverthorne Lumber* in a lengthy footnote. *Id.* at 352 n. 8, 94 S.Ct. at 622 n. 8. The Court first noted that *Silverthorne Lumber* involved defendants who had already been indicted by the grand jury and thus could invoke the exclusionary rule based on their status as criminal defendants. Apparently, the government in *Silverthorne Lumber* sought to subpoena the documents not to present to the grand jury for use in its accusatorial function, but for use at trial. *Id.* Second, at the time the government issued its subpoena to the Silverthorne Lumber Company, the district court already had determined that the search and seizure were illegal. *Id.* Delay of grand jury proceedings by a lengthy suppression hearing thus was unlikely in *Silverthorne Lumber*, whereas in *Calandra* the constitutionality of the search and seizure had not been adjudicated before the issuance of the subpoena.

In this case, unlike *Calandra*, a court already has determined that the "tree" was "poisonous." *See Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir.1985). Even assuming, without deciding, that this determination by the Tenth Circuit is binding on the parties under the principle of issue preclusion,[1] rendering unnecessary further litigation on the constitutionality of the Colorado search, the logic of *Calandra* still precludes application of the exclusionary rule. The legality of a search is not the only issue that must be considered at a suppression hearing. The district court still would have to hear and weigh evidence on wheth-

---

1. *See generally United States v. Stauffer Chemical Co.*, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984); Note, *Intercircuit Conflicts and the*

*Enforcement of Extracircuit Judgments*, 95 Yale L.J. 1500 (1986).

er the information underlying the subpoena was actually the fruit of the illegal search, and whether the government had obtained or would have obtained that information from an independent source. *See Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Silverthorne Lumber*, 251 U.S. at 392, 40 S.Ct. at 183.

Moreover, delay is not the only factor counseling against application of the exclusionary rule to grand jury proceedings. In *Calandra*, the Supreme Court made clear that "the [exclusionary] rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment." 414 U.S. at 347, 94 S.Ct. at 619–20. The application of the exclusionary rule to grand jury proceedings advances that goal only minimally, at best. Because defendants may invoke the exclusionary rule at trial, any extension of the exclusionary rule would deter "only police investigation consciously directed toward the discovery of evidence solely for use in a grand jury investigation." *Id.* at 351, 94 S.Ct. at 621. Such minimal benefit is clearly outweighed by the cost of depriving the grand jury of relevant evidence. We therefore see no reason to deviate from the principles established in *Calandra*.

Because we conclude that the district court could not invoke the exclusionary rule to quash the subpoena on fourth amendment grounds, we need not consider the district court's conclusion that the government would have obtained the information underlying the subpoena from independent sources.

### III.

Appellants argue that enforcement of the subpoena issued to Roberts would violate their freedom of expressive association. Although we ultimately conclude that the first amendment does not bar enforcement of the subpoena, we must address what the first amendment requires

the government to demonstrate in cases such as this one.

### A.

■ In *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed. 2d 1488 (1958), a unanimous Supreme Court first gave full expression to the right now recognized as freedom of "expressive association." [2] Alabama had brought suit against the NAACP, seeking its expulsion from the state for failure to comply with a statute requiring the registration of all foreign corporations transacting intrastate business. Alabama moved for production of documents that would disclose the names and addresses of all Alabama members and agents of the NAACP, arguing that it needed the information to prepare for an evidentiary hearing. The NAACP refused to comply with the production order and was adjudged in civil contempt by a state court.

The United States Supreme Court reversed. The Court first concluded that "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment." *Id.* at 460, 78 S.Ct. at 1171. The Court stated further that the NAACP members' freedom of association necessarily entailed the right to privacy in their association, for "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* at 462, 78 S.Ct. at 1172. It was irrelevant that Alabama had not sought to restrict free association directly, because "abridgment of such rights, even though unintended, may inevitably follow from varied forms of governmental action." *Id.* at 461, 78 S.Ct. at 1171.

*NAACP v. Alabama* suggested that when the compelled disclosure of affiliation with groups engaged in advocacy would

---

**2.** *See Board of Directors v. Rotary Club,* —— U.S. ——, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987). A plurality of the Court had advanced the concept of freedom of association in *Sweezy*

*v. New Hampshire,* 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *see also De Jonge v. Oregon,* 299 U.S. 353, 364, 57 S.Ct. 255, 259, 81 L.Ed. 278 (1937).

impair the exercise of freedom of association, such disclosure could be ordered only if the government demonstrated that the requested information had a "substantial bearing" on a compelling governmental interest. *Id.* at 464, 78 S.Ct. at 1173.[3] Further cases refined this test. In *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed. 2d 231 (1960), a challenge to a state statute requiring public school teachers to reveal all organizations to which they had belonged within the past five years, the Supreme Court reexamined *NAACP v. Alabama* and concluded that in the *NAACP* case "there was no *substantially relevant* correlation between the governmental interest asserted and the State's effort to compel disclosure of the membership lists involved." 364 U.S. at 485, 81 S.Ct. at 250 (emphasis added). Finally, in *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed. 2d 929 (1963), the Court stated the test as follows:

> [R]egardless of the label applied, be it "nexus," "foundation," or whatever … it is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest.

*Gibson,* 372 U.S. at 546, 83 S.Ct. at 893–94.

The government argues, however, that appellants may not invoke the protection of *NAACP v. Alabama* and its progeny because the records that would reveal NCBA's membership are held by Roberts, not NCBA or its members. In so arguing, the government urges us to adopt the reasoning advanced by Judge Wilkey in *Reporters Committee for Freedom of the Press v. American Telephone & Telegraph Co.,* 593 F.2d 1030, 1053–60 (D.C. Cir.1978), *cert. denied,* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979), that the first amendment affords no "extra margin of privacy" by imposing substantive or procedural restrictions on good faith criminal investigations beyond the limits imposed by the fourth and fifth amendments. *See id.* at 1054.

That portion of Judge Wilkey's opinion was not joined by any other judge of the D.C. Circuit, and to our knowledge the holding that it proposed has never been adopted by the Supreme Court or any of the federal courts of appeals. *See, e.g., In re Grand Jury Subpoena to First National Bank,* 701 F.2d 115, 116–17 (10th Cir. 1983) (specifically rejecting position advanced here by government); *Local 1814, International Longshoreman's Association v. Waterfront Commission,* 667 F.2d 267, 271 (2d Cir.1981) (same); *see also United States v. Trader's State Bank,* 695 F.2d 1132 (9th Cir.1983) (per curiam); *United States v. Citizens State Bank,* 612 F.2d 1091 (8th Cir.1980). The proposal is also in considerable tension with *Pollard v. Roberts,* 283 F.Supp. 248 (E.D.Ark.), *aff'd mem.,* 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968). In *Pollard,* a three-judge district court, including then-Circuit Judge Blackmun, concluded that the enforcement of a subpoena duces tecum directed to the First National Bank of Little Rock, requiring the production of records that would identify contributors to the Arkansas Republican Party, would violate the contributors' and the Party's freedom of association. The *Pollard* court found no showing that the identities of the contributors was relevant to the state's unquestionably legitimate interest in preventing vote buying. *Id.* at 257.

The Supreme Court summarily affirmed the judgment of the three-judge district court. *Roberts v. Pollard,* 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968) (per curiam). Whatever may be the difficulties in interpreting the precise import of a summary affirmance by the Supreme Court, *cf. Hardwick v. Bowers,* 760 F.2d 1202 (11th

---

**3.** In *NAACP v. Alabama,* the Supreme Court concluded that the NAACP's membership lists did not have a substantial bearing on Alabama's asserted interest of registering foreign corporations transacting intrastate business. The Supreme Court could discern no nexus between the state interest and the list of NAACP's members, as opposed to the names of its chief officers, or information about its business address.

Cir.1985), *rev'd,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), without doubt a summary affirmance is a judgment on the merits, preventing "lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (per curiam). Most importantly, "[s]ummary actions ... *should not be understood as breaking new ground* but as applying principles established by prior decisions to the particular facts involved." *Id.* (emphasis added). The summary affirmance of *Pollard v. Roberts* applied the principles of *NAACP v. Alabama* to the facts of the case, including the fact that the relevant records were held by the bank, not the party or its contributors. We must conclude, therefore, that appellants can invoke the protection of the first amendment freedom of association to challenge the subpoena directed to Roberts.

The Supreme Court would hardly have affirmed *Pollard* if the first amendment offers no greater protection of privacy than the fourth and fifth amendments. By the time of the *Pollard* decision, the law—at least arguably—already was established that an individual has no claim under the fourth amendment to resist the production of business records held by a third party. *See United States v. Miller,* 425 U.S. 435, 444, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976) ("general rule" is that issuance of subpoena to third party to obtain the records of that party does not violate the rights of a defendant, even if criminal prosecution is contemplated when subpoena is issued; these principles were settled before passage of Bank Secrecy Act of 1970).

### B.

Having determined the law that governs this area, we turn to its application to this appeal. Initially we must consider whether the appellants are engaged in the type of "expressive association" entitled to the protection of the first amendment. The government argues that NCBA engages in

no protected activity at all but merely provides its members with banking services designed to leave no record of the financial transactions. Appellants contend that NCBA engages in political activity of the sort implicating the core principles of the first amendment. Indeed, the record reflects that NCBA publishes literature and sponsors seminars designed to alert the public to the dangers of the purportedly unconstitutional income tax and Federal Reserve System.[4]

At the very least, NCBA exists both to promote its members' political opinions and to provide the members with financial services not warranting the protection of the first amendment. The case law provides little specific guidance as to the level of protection afforded such organizations with dual or multiple purposes. The cases have usually involved either those organizations whose very heart and soul are protected political activity, *see, e.g., Tashjian v. Republican Party,* —— U.S. ——, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986); *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), or, at the other end of the spectrum, organizations and individuals whose "association" furthers little, if any, expressive activity. *See, e.g., IDK, Inc. v. County of Clark,* 836 F.2d 1185 (9th Cir.1988) (escort services); *Rivers v. Campbell,* 791 F.2d 837 (11th Cir.1986) (per curiam) (vendor of sno-cones to schoolchildren). Yet many organizations promote both political activity and the economic well-being of its members. Labor unions frequently serve both functions. *See, e.g., Abood v. Detroit Board of Education,* 431 U.S. 209, 222, 235–36, 97 S.Ct. 1782, 1792, 1799–1800, 52 L.Ed.2d 261 (1977). So do law firms, *see Hishon v. King & Spalding,* 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984); *NAACP v. Button,* 371 U.S. 415, 429–30, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963); clubs, *see Roberts v. United States Jaycees,* 468 U.S. 609, 612–14, 104 S.Ct. 3244, 3246–48, 82 L.Ed.2d 462 (1984); *New York State Club Association v. City of New York,* 69 N.Y.2d 211, 513 N.Y.S.2d

---

**4.** The Tenth Circuit has concluded that NCBA engages in protected activity. *In re Grand Jury* *Subpoena to First National Bank,* 701 F.2d 115 (10th Cir.1983).

349, 505 N.E.2d 915, *prob. juris. noted*, —— U.S. ——, 108 S.Ct. 62, 98 L.Ed.2d 26 (1987); and churches. Governmental regulation of the unprotected activities of these groups may well impinge on the protected activities. Revealing the names of the persons who participated in NCBA's commercial activities, for example, could also reveal the names of adherents to NCBA's ideology.

A review of the Supreme Court's opinion in *Roberts v. United States Jaycees* convinces us that the approach actually taken by the Court in that case was one that can be applied to every organization: The Court simply considered the effect of the challenged state action on the Jaycees' freedom of expressive association. *See United States Jaycees*, 468 U.S. at 618, 104 S.Ct. at 3249; *see also Board of Directors v. Rotary Club*, —— U.S. ——, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987) (following "the same course" as in *United States Jaycees* ). The Supreme Court recognized that the Jaycees promoted both protected and unprotected activities. The Court noted that the Jaycees "have taken public positions on a number of diverse issues," and that members "regularly engage in a variety of civic, charitable, lobbying, fundraising and other activities worthy of constitutional protection under the First Amendment." 468 U.S. at 626–27, 104 S.Ct. at 3254. On the other hand, the Jaycees undeniably engaged in commercial activity, such as developing "program kits" to enhance members' management skills. *Id.* at 614, 104 S.Ct. at 3247. This significant amount of commercial activity did not alter the standard of review applicable to the Jaycees' challenge, although it did make the application of the challenged state law less likely to be disruptive of any political message that the Jaycees might have promoted.[5]

### C.

■ In applying the test implicit in *United States Jaycees* to NCBA, we encounter one further difficulty: It is unclear from the case law precisely what factual showing, if any, NCBA must make to establish that its freedom of association would be impinged by enforcement of the subpoena. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), the Supreme Court rejected the appellants' argument that the disclosure requirements of the Federal Election Campaign Act was unconstitutional as applied to minor parties. The *Buckley* Court noted that in *NAACP v. Alabama,* the petitioners had made a showing that previous disclosure of the identity of its members had exposed those members to actual and threatened reprisal. *Buckley*, 424 U.S. at 69, 96 S.Ct. at 658. In *Buckley*, however, the Supreme Court found that kind of showing to be absent. "[N]o appellant in this case has tendered record evidence of the sort proffered in *NAACP v. Alabama.* Instead, appellants primarily rely on 'the clearly articulated fears of individuals, well experienced in the political process.' ... At best they offer the testimony of several minor-party officials that one or two persons refused to make contributions because of the possibility of disclosure." *Buckley*, 424 U.S. at 71–72, 96 S.Ct. at 660 (quoting appellants' brief). This passage suggests that a merely subjective fear of future reprisal is insufficient to establish a restraint on freedom of association. The Supreme Court recognized the difficulties of formally proving the evils of chill and

---

5. In her concurring opinion in *Roberts v. United States Jaycees,* Justice O'Connor suggested that "an association should be characterized as commercial, and therefore subject to rationally related state regulation of its membership and other associational activities, when, and only when, the association's activities are not *predominantly* of the type protected by the First Amendment. It is only when the association is predominantly engaged in protected expression that state regulation of its membership will necessarily affect, change, dilute, or silence one

collective voice that would otherwise be heard." *United States Jaycees,* 468 U.S. at 635–36, 104 S.Ct. at 3259 (emphasis added). Justice O'Connor's approach would require us to decide as a threshold matter whether NCBA was "predominantly" engaged in commercial activities. This concurring opinion was not joined by any other member of the Court, however, and the approach has been rejected by one other court of appeals. *See Trade Waste Management Association, Inc. v. Hughey,* 780 F.2d 221, 238 (3d Cir. 1985).

harassment, however, and accordingly required only that minor parties show "a reasonable probability that the compelled disclosure ... will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.* at 74, 96 S.Ct. at 661; *cf. Brown v. Socialist Workers '74 Campaign Committee,* 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (concluding that Socialist Workers Party had made this showing).

Another passage of *Buckley*, however, suggests that the "reasonable probability" test is not applicable to appellants. In footnote 83, the Supreme Court stated, "Nor is this a case comparable to *Pollard v. Roberts* ..., in which an Arkansas prosecuting attorney sought to obtain, by a subpoena duces tecum, the records of a checking account (including the names of individual contributors) established by a specific party, the Republican Party of Arkansas." *Buckley,* 424 U.S. at 69 n. 83, 96 S.Ct. at 659 n. 83. Indeed, in *Pollard*, the three-judge district court admitted that "there is no evidence of record in this case that any individuals have as yet been subjected to reprisals on account of the contributions in question," 283 F.Supp. at 258, but added, "it would be naive not to recognize that the disclosure of the identities of contributors to campaign funds would subject at least some of them to potential economic or political reprisals of greater or lesser severity." *Id.*[6] *Buckley* and *Pollard* thus suggest that when a government investigation into possible violations of law has already focused on a particular political group or groups,[7] the showing required to establish an infringement of freedom of association is more lenient than the *Buckley* standard. This more lenient requirement could be justified on the rationale that the government

investigation itself may indicate the possibility of harassment.

In the instant case, we need not decide the precise evidentiary standard applicable to NCBA's motion to quash. Even assuming *arguendo* that NCBA can demonstrate an infringement of its freedom of association, the government nonetheless has established a justification for this infringement. "The right to associate for expressive purposes is not ... absolute." *Roberts v. United States Jaycees,* 468 U.S. at 623, 104 S.Ct. at 3252. "[T]here are governmental interests sufficiently important to outweigh the possibility of infringement...." *Buckley v. Valeo,* 424 U.S. at 66, 96 S.Ct. at 657. As explained above, the government may take action that would infringe upon the freedom of association when it can demonstrate a "substantial relation" to a compelling interest. *See Buckley v. Valeo,* 424 U.S. at 64, 96 S.Ct. at 656; *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. at 546, 83 S.Ct. at 893.

There is no doubt that this case implicates a compelling governmental interest. The government is investigating possible criminal violations of the tax laws and suggests that individuals may be using the structure of NCBA's financial system to evade requirements for reporting taxable income. A good-faith criminal investigation into possible evasion of reporting requirements through the use of a private banking system that keeps no records is a compelling interest. "No power is more basic to the ultimate purpose and function of government than is the power to tax." *Bates v. City of Little Rock,* 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960).

We consider, finally, whether the government has established a "substantial rela-

6. Similarly, in *In re Grand Jury Subpoena to First National Bank,* 701 F.2d 115 (10th Cir. 1983), the Tenth Circuit held that NCBA had made a sufficient showing of a possible first amendment violation largely because of the "readily apparent" chilling effect of a grand jury subpoena. *Id.* at 118. The Tenth Circuit's opinion does not reveal whether NCBA had made a showing of past or present harassment. The opinion states that "petitioner's affidavits have made a sufficient showing of a potential First

Amendment violation to warrant an evidentiary hearing," *id.,* without indicating what those affidavits contained.

7. In *Pollard,* the prosecuting attorney sought the checking account records for an investigation into suspected "vote buying" on behalf of Republican candidates in violation of Arkansas election laws. 283 F.Supp. at 252.

tion" between the information sought and the compelling interest. We have examined the records under seal forwarded to us from the district court, and we conclude that the government has made this showing.

Accordingly, the order of the district court denying appellants' motion to quash is AFFIRMED.