**UNITED STATES of America, Plaintiff,**

**v.**

**Vernon O. HOLLAND, James Davis Drane Mauldin, Jr., Defendants.**

**No. 90–CR–10–B.**

United States District Court, N.D. Oklahoma.

Jan. 12, 1993.

---

Neal B. Kirkpatrick, Kenneth P. Snoke, Asst. U.S. Attys., Tulsa, OK, for plaintiff.

James D. Williams, Tulsa, OK, Lowell H. Becraft, Jr., Huntsville, AL, William A. Cohan, Encinitas, CA, for defendants.

## ORDER

BRETT, District Judge.

This matter comes on for consideration of Defendants' Verified Motion To Dismiss Indictment Based on Discriminatory and Vin-

dictive Prosecution filed on November 27, 1992.[1] Also under consideration is the Court's *sua sponte* Order of December 7, 1992, directing the parties to submit briefs addressing the following:

> "In view of the Court dismissing the conspiracy count (Count 1) with prejudice, at the request of the Government, and thereafter the Tenth Circuit Court of Appeals ruling (on Defendants' double jeopardy appeal) that jeopardy has attached to Count 1, and in light of the second predicate violation requirement of 31 U.S.C. § 5322(b) ("while violating another law of the United States"), is the conspiracy count, to which jeopardy has attached, available as a predicate second violation as charged in the Indictment? If not available, is Defendant Holland subject to potential conviction under § 5322(a) as a lesser included offense of § 5322(b)?"

Defendants' vindictive prosecution motion is essentially based upon the premise that: The First Amendment bars a prosecution that would not have been brought but for a desire to discourage protected expression, even if there might also have been a permissible motive for prosecution. Upon such premise Defendants allege: (A) The National, Regional and District officials (of the Internal Revenue Service) developed a strategy designed to eliminate NCBA/FEA's[2] boycott against the Federal Reserve throughout the United States, including associational rights and other activity they knew was protected by the First Amendment; and (B) This unconstitutional strategy was applied to Defendants.[3]

Defendants begin their efforts by stating "[I]t is uncontroverted that the Freeman Education Association/National Commodity and Barter Association are unincorporated, voluntary political, educational associations, opposed to the current tax, fiscal and monetary

1. The Court notes Defendants' Motion is considerably out of time, the deadline for filing defense motions having been set for December 29, 1990. Notwithstanding, the Court will consider Defendants' instant Motion as if timely filed.

2. National Commodity Barter Association/Freeman Educational Association.

3. These issues were set forth in Defendants' filing of January 4, 1993. Defendants' 55 page Verified Motion, filed November 27, 1992, set forth these same issues in longer form. Attached to such Motion were Exhibits 1–41, comprised of a few hundred pages of non-tabbed, non-indexed material.

laws and policies of the United States.[4] The Court views the record herein and the rather sizeable body of "tax protesters" case precedent as amply supporting this.

Defendants next state that IRS district tax protester coordinator William Walter considered the NCBA as "a classic tax protester organization"[5]; that Walter explained that the NCBA was formed as the result of NCBA's founder, John Grandbouche, running for Lieutenant Governor of Colorado in 1978, and a large part of Mr. Grandbouche's platform consisted of tax protester ideas; that Walter testified that the IRS had a campaign to identify members of the NCBA and investigate them.[6] Defendants argue that John Pleasant, a highly visible member of NCBA[7], has testified that NCBA has been subjected to "almost continuous grand jury and/or IRS criminal investigations from 1979 to date".

Defendants further argue it is uncontroverted that the IRS maintains a list in its national computer system which identifies individuals classified as "illegal tax protesters."

Defendants state that John Pleasant was provided, in 1983, a document by the Austin Service Center Freedom of Information Office in response to a request he made. Pleasant testified that the document is:

> "[A] statement of the results of a study group formed in the national office to deal or to begin setting policy with how the Internal Revenue Service is going to respond to the illegal tax protest movement."

Pleasant, in his testimony, quoted the document after summarizing it:

> "I recall spending a considerable period of time going through this document and being surprised at some of the language.... Somewhere in here is the policy determination that they're going to seek to stifle this dissent by going to national organizations and seeking to take out the leaders either by criminal or civil prosecution and cut off the head in order to kill the body."

> \* \* \* \* \* \*

> "COHAN: ... and that last sentence, would you read that, please?
> PLEASANT: "The recommendation is to have a centralized CID task force to concentrate its investigative efforts on such problem areas ... problem areas as tax protest leaders.... Such a task force in this area would definitely be conducive to the concept of cutting off the head, i.e., the national leaders who are constantly on the move from service district to service district to kill the body." ". (Although the Defendants have virtually inundated the Court with pleadings, papers and filings on various issues, this document, a quote from which is offered on a critical, or perhaps the critical issue, is not provided to the Court.)

Defendants next argue that, in the present case, Agent John Thomas has testified that Thomas was aware that "leaders" were the focus of investigations; that Thomas "certainly came to consider" Vernon Holland to be classified as a leader of a tax protest movement.

Defendants state that on April 5, 1985, IRS Special Agents executed search warrants at seven locations in five states against NCBA in connection with its investigation into warehouse banking, seizing *inter alia* membership lists; that on October 16, 1985,

---

**4.** It is unclear whether Defendants characterize FEA and NCBA as one monolithic association or two separate associations (as perceived by Court from the record herein).

**5.** Walter's testimony was given November 19, 1992, in *National Commodity and Barter Association, et al., v. United States of America, 89–M–1912, United States District Court for the District of Colorado.* The exact testimony was: "The NCBA was—I guess I could say it was a classic tax protester organization."

**6.** The exact testimony was:

> "Q Well, you say the NCBA, but you're really talking about NCBA members and their individual tax liabilities, aren't you?
> A That's the way—yes, sir. That's the way we had been approaching the NCBA, was identifying known members and, first of all, seeing what their situation was, if they'd filed tax returns. And at least as far as I was involved in the examination division, I was focusing exclusively on those that had not filed tax returns."

**7.** See *Pleasant v. Lovell,* 876 F.2d 787 (10th Cir. 1989), a case where members of NCBA brought an action against IRS agents.

the IRS executed simultaneous searches and seizures of the satellite NCE exchanges in California, Washington, Oregon and Georgia, also seizing membership lists. Defendants state these lists were distributed to the Chiefs, Criminal Investigation Division, in the respective district offices to be used as information items.

During the trial of this case Agent Thomas testified that "information items" existed as to FEA, Defendants and others. At the December 23, 1992 hearing Thomas testified these items of information, which comprised his first awareness of FEA and/or these Defendants, came from three sources during a 90 day period of time from January 1 to March 30th, 1987: (1) IRS Agent Brennan who responded to an ad in New Jersey that indicated FEA operated a warehouse bank which was offering services that would, in the opinion of the IRS, help to conceal the income and assets of its membership from government agencies, state and federal; (2) received information from IRS Agent David Jansen who was involved in a grand jury investigation that some of the banks in Tulsa had provided information concerning possible Title 31, Section 5324 violations with relation to structuring transactions; and (3) received referrals from the Collection Division of IRS on people who had been identified as having some connection to the Freeman Education Association because they had failed to file returns for a good many years.

Defendants complain these information items concerning Defendants and Freeman Education Association have not been produced to the present date notwithstanding Defendants' Motion For Disclosure of Exculpatory Evidence also filed November 27, 1992.

Defendants main thrust is that the IRS, armed with the NCBA membership lists, began a campaign to purge the membership by initiating criminal and civil actions against individuals identified on the lists across the nation; that this unconstitutional strategy was applied to Defendants.

Defendants next assail (again) the search of FEA headquarters, which occurred September 15, 1987. The constitutionality of this search was approved by this Court in its Order of July 20, 1990 (docket # 71). Likewise, much of Defendants' 55 page Motion filed November 27, 1992, is a review of the NCBA activity and litigation which occurred for the most part in the state of Colorado during the late 70s and 80s. Its only relevance is Defendants' present attempt to demonstrate an unconstitutional scheme on the part of the IRS to suppress the First Amendment rights of the NCBA, NCE, FEA and the various membership thereto, in light of the Tenth Circuit's recent pronouncement in *United States v. P.H.E., Inc. a/k/a Adam & Eve, et al,* 965 F.2d 848 (10th Cir.1992).

In *P.H.E.*, obscenity Defendants sought dismissal of an indictment based upon alleged vindictive prosecution. The lower Court denied Defendants' motion to dismiss and Defendants appealed. The Tenth Circuit determined that Defendants had indeed established vindictive prosecution thereby shifting the burden to the Government prosecutors to justify their decision to indict Defendants, with legitimate, articulable and objective reasons.

*P.H.E.* was the product of then Utah United States Attorney Brent Ward's desire, in 1985, to coordinate a nationwide prosecution strategy against companies that sold obscene materials. Ward suggested to then Attorney General Edwin Meese that a coordinated effort by all thirty-five strike force prosecutors could instigate multiple, expense-prone prosecutions severely testing the limits of pornographers' endurance. Ward believe the targeted companies would curtail their operations and they would withdraw from and refrain from entering geographical markets in which they could not find community acceptance. Assistant U.S. Attorney Richard Lambert, a prosecutor in the *P.H.E.* case, worked with Ward on the project.

Notwithstanding the Department of Justice's policy discouraging multiple obscenity prosecution unless the materials were unquestionably obscene, the Department changed its policy in September 1987, presumably at the urging of Ward and/or Lambert. However, Lambert's dealings with PHE began in 1986.

In May of 1986 PHE's premises in North Carolina were searched by federal and state agents, including federal prosecutors from Utah and the Eastern District of North Carolina. Federal agents also served PHE's employees with 118 subpoenas.

PHE's attorneys met with Ward and Lambert in September, 1986 to see if a plea agreement could be worked out.

"At these meetings, Ward and Lambert stated that the only way the defendants could avoid multiple prosecutions was by ceasing distribution in Utah of all sexually oriented materials, not simply those that were obscene (an exception was made for films that had received an "R" rating from the Motion Picture Association of America.) *Id.* It bears emphasis that Ward and Lambert acknowledged that this would require the company to stop sending material that was protected by the First Amendment." *Id.* at 851.

During these negotiations, Lambert stated that if no plea agreement was reached, prosecution could be brought in Utah and elsewhere in the country, specifically Alamance County, North Carolina (the main office of PHE).

No plea agreement being reached, prosecutions and related civil litigation followed, resulting in an injunction being issued in Washington, D.C. federal court, "barring Lambert and others from "causing or permitting indictments charging violations of 18 U.S.C. §§ 1461–65 to be returned against plaintiffs, or either of them, in more than one federal judicial district within the United States" pending a ruling on the permanent injunction." *PHE, Inc. v. Department of Justice,* 743 F.Supp. 15, 28 (D.D.C.1990). The Court state its conclusions thus:

"The intrusive and intimidating manner in which defendants searched plaintiffs' premises, the 118 subpoenas which another federal court characterized as "harassment" of plaintiffs, the acknowledgement by the defendants that many of the materials they seek to prevent plaintiffs from distributing *are* constitutionally protected, the allegation that investigations were initiated despite the fact that the FBI advised [the] Assistant United States Attorney for the Eastern District of North Carolina[ ] that the materials distributed by plaintiffs were not within the scope of FBI guidelines for the prosecution or investigation of obscenity, the threats of multiple prosecutions if plaintiffs did not cease distribution of certain materials nationwide and cease distribution entirely in Utah including *Playboy* magazine and *The Joy of Sex,* and the admitted desire to get Harvey "out of the business," substantiate plaintiffs' allegations of bad faith."

After the Washington D.C. District Court issued a preliminary injunction, Lambert urged prosecution of PHE to the new Utah United States Attorney, Dee Benson. The Utah grand jury returned an indictment against PHE and others. The Defendants moved for dismissal, arguing the prosecution was in bad faith.

The District Court rejected the bad faith claim, failing to find a connection between the litigative efforts in North Carolina, Washington, D.C. and other points East and the instant prosecution, and also noting there was no allegation of bad faith motivation on the part of new U.S. Attorney Benson. An appeal followed.

The Tenth Circuit acknowledged the Supreme Court's recognition that a limited appeal exception exists for certain collateral orders that do not terminate an action, *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), and that the District Court's Order implicated "important right[s] which would be 'lost, probably irreparably,' if review had to await final judgment …". *Abney v. United States,* 431 U.S. 651, 658, 97 S.Ct. 2034, 2039–40, 52 L.Ed.2d 651 (1977). Taking jurisdiction, the Tenth Circuit observed that the actual act of going to trial under a pretextual prosecution has a chilling effect on protected expression and the right asserted is a "right not to be tried", citing *United States v. Hollywood Motor Car,* 458 U.S. 263, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982). Further, the Tenth Circuit alluded to its teachings in *Bender v. Clark,* 744 F.2d 1424 (10th Cir. 1984) where it recognized that "the danger of injustice by delaying appellate review out-

weighs the inconvenience and costs of piece-meal review." *Id.* at 1427.

After reviewing the Washington D.C. Federal Court injunction against Lambert, described therein as a showing of bad faith in at least seven separate instances in that Court's narrative of facts, the Tenth Circuit concluded that Lambert was extensively involved in the multiple prosecution strategy against the PHE Defendants, and that the district court's finding to the contrary was clearly erroneous. Further, the Tenth Circuit declined to accept the Government's proposition that a single untainted prosecutor or investigative agent can cleanse an otherwise vindictive prosecution, citing *United States v. Raymer*, 941 F.2d 1031 (10th Cir.1991) which held the inquiry must be whether, as a practical matter, there is a reasonable likelihood of prosecutorial conduct that would not have occurred but for some hostility or punitive animus towards a Defendant because of exercising specific legal rights. *Raymer* explained how the test was to be applied:

> "A defendant has the burden of proof and must establish either (1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness. Thereafter, the burden shifts to the prosecution to justify its decision with legitimate, articulable, objective reasons." *Id.* at 1040.

In *P.H.E.* the Tenth Circuit, having already concluded that the PHE Defendants had already satisfied their burden of showing that the indictment is the tainted fruit of a prosecutorial attempt to curtail PHE's future First Amendment protected speech, remanded the matter to allow the Government an opportunity "to justify its decision with legitimate, articulable, objective reasons." *Id.* at 1040.

This Court's hearing of December 23, 1992, was held to allow the Defendants to establish either actual vindictiveness, or a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness. If done, the burden would shift to the prosecution to justify its decision with legitimate, articulable, objective reasons.

Cases involving singular First Amendment product (only the written word, the spoken word, visual images, etc. and nothing more) lend themselves to a more pure form of constitutional analysis. These cases can be approached in a relatively straightforward manner. However, cases which involve First Amendment product wrapped around and intrinsically interwoven with alleged criminal activity give courts greater pause. Further complications arise when the alleged criminal activity (e.g. alleged violation of the income tax laws) is clothed with political assertions of unconstitutional measure, i.e. the income tax is illegal, the income tax should not be paid because it is contrary to the Constitution of the United States, the federal reserve system is invalid because not based upon the gold standard and so forth.

■ If the alleged criminal activity is patently criminal no amount of First Amendment involvement would deter lawful prosecution. An extreme example would be if a political organization advocating return to the gold standard, elimination of the federal reserve system, and other non main-stream ideologies, would espouse, encourage, aid and abet (including how-to seminars) the robbing and/or burglarizing of all federal reserve banks. First Amendment arguments to explain and defend such criminal behavior would be to no avail.

First Amendment political organizations that (voluntarily) become involved with the income tax laws of the United States present complex issues. Other courts have struggled with this imbroglio. In *In re Grand Jury Proceeding*, 842 F.2d 1229 (11th Cir.1988), a case involving NCBA and its affiliate NCE, the following appears:

> "NCBA is an association dedicated to limited government, privacy in personal and financial affairs, and the protection of private property. NCBA advocates home education of children, the abolition of the Internal Revenue Service, and a return to the gold standard. It disputes the constitutionality of the Federal Reserve System and many of the federal administrative agencies. NCBA publishes books and newsletters alerting its members to the dangers posed by environmental pollution,

unsound currency, and the growth of the federal government.

NCBA also provides its members with various financial services. For example, members can participate in a plan under which NCBA pays legal expenses for IRS audits and criminal tax prosecutions. Most importantly for purposes of this appeal, NCBA operates, through its wing NCE, a service through which members can purchase precious metals and pay bills with a minimum of recordkeeping. Under this plan, appellant William Bicket, the Atlanta area representative of NCBA, receives checks from members to be deposited in an "account" created for them by NCBA. Bicket collects the checks and forwards them to NCBA with forms in the nature of deposit slips. NCBA then disburses funds according to its members' instructions, without any indication that the disbursements are paid from any particular member's account. *Id.* at 1230.

\* \* \* \* \* \*

The financial system operated by NCBA obviously provides significant opportunities for the evasion of federal tax laws, especially requirements for the reporting of taxable income. *Id.* at 1230.

\* \* \* \* \* \*

... Even assuming *arguendo* that NCBA can demonstrate an infringement of its freedom of association, the government nonetheless has established a justification for this infringement. 'The right to associate for expressive purposes is not ... absolute.' *Roberts v. United States Jaycees,* 468 U.S. [609] at 623, 104 S.Ct. [3244] at 3252 [82 L.Ed.2d 462 (1984) ]. '[T]here are governmental interests sufficiently important to outweigh the possibility of infringement....' *Buckley v. Valeo,* 424 U.S. [1] at 66, 96 S.Ct. [612] at 657 [46 L.Ed.2d 659 (1976) ]. As explained above, the government may take action that would infringe upon the freedom of association when it can demonstrate a "substantial relation" to a compelling interest. *See Buckley v. Valeo,* 424 U.S. at 64., 96 S.Ct. at 656; *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. [539] at 546, 83 S.Ct. [889] at 893 [9 L.Ed.2d 929 (1963) ].

There is no doubt that this case implicates a compelling governmental interest. The government is investigating possible criminal violations of the tax laws and suggests that individuals may be using the structure of NCBA's financial system to evade requirements for reporting taxable income. A good-faith criminal investigation into possible evasion of reporting requirements through the use of a private banking system that keeps no records is a compelling interest. "No power is more basic to the ultimate purpose and function of government than is the power to tax", *Bates v. City of Little Rock,* 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960)." *Id.* at 1236.

In the case of *Pleasant v. Lovell,* 876 F.2d 787 (10th Cir.1989) the following appears:

"Some record evidence suggests that NCBA members may have advocated or participated in various schemes designed to evade federal income tax. These included engaging in a barter system for the purpose of not recognizing taxable income, submitting incorrect employee withholding forms (Form W–4) claiming exemption from federal tax withholding, and transacting business through a warehouse bank, such as the National Commodity Exchange (NCE), so as to avoid IRS scrutiny concerning cash deposits and payments, *see Heinhold Hog Market, Inc. v. McCoy,* 700 F.2d 611, 616 (10th Cir.1983). While the political speech of NCBA members is protected by the first amendment, the same is not true of speech encouraging or facilitating illegal activity. *Id.* at 790.

\* \* \* \* \* \*

... Indeed the plaintiffs have submitted evidence indicating that various NCBA members are now reluctant to associate with the group. At the same time, we recognize that some interference may be permissible when the government can demonstrate a compelling interest, such as good-faith criminal investigation that is narrowly tailored to detect information concerning tax evasion. *In re Grand Jury Proceeding.* 842 F.2d at 1236." *Id.* at 804–805.

■ The Court is of the view that, under the record herein, the government has amply demonstrated a compelling interest, i.e. a good-faith criminal investigation, sufficiently focused on Defendants' non-First Amendment activities.[8] The Court also concludes that Defendants have failed to demonstrate that the instant case results from selective and/or vindictive prosecution emanating from bad motivation or animus on the part of the Internal Revenue Service generally or Agent John Thomas specifically. The Court further concludes that, even if the record demonstrated that this prosecution arose solely as a result of IRS' seizure of NCBA membership lists (which presumptively included Defendants' names thereon), which the Court believes the record fails to demonstrate, this prosecution would not be tainted as violative of Defendants' First Amendment rights.[9]

Defendants' Verified Motion To Dismiss Indictment Based on Discriminatory and Vindictive Prosecution should be and the same is hereby DENIED.

The Court next addresses the issues stated in its *sua sponte* Order of December 7, 1992.

After reexamination of the Tenth Circuit's Opinion and Judgment entered on February 13, 1992, and filed herein on April 13, 1992, and the record and pleadings including the pleadings filed in response to the Court's Order, the Court concludes the Tenth Circuit more than adequately disposed of the double jeopardy issue again urged by Defendants. Further, the Court's Order of July 25, 1991, which was appealed to the Tenth Circuit, wherein the Court found no double jeopardy as to the remaining counts as a result of the Government-urged dismissal of Count One, also granted the Government's previous motion and ordered the deletion of language referencing the conspiracy count, 18 U.S.C. § 371, from Counts Three, Four and Five

and also amended the charged subsection of Section 5322 from "(b)" to "(a)". Defendants failed to appeal this aspect of the Court's Order.

Further, the Court concludes the "lesser include offense" potential issue is moot in view of the above. To the extent Defendants have outstanding a renewed Motion To Dismiss on the issue of Double Jeopardy and/or the issues suggested in the Court's Order of December 7, 1992, the same is OVERRULED.

In summary, the Court DENIES Defendants' Verified Motion To Dismiss Indictment Based on Discriminatory and Vindictive Prosecution, and also DENIES Defendants' Motion To Dismiss on the issue of Double Jeopardy and/or the issues suggested in the Court's Order of December 7, 1992.

The severed cases will proceed to jury trial as set forth in the Court's Order of December 29, 1992.

IT IS SO ORDERED.

---

8. The record herein, including the evidence developed in the previous trial demonstrates that the activities of the FEA are similar in most respects to that of the NCBA in *In re Grand Jury Proceeding,* and *Pleasant v. Lovell, supra,* just discussed.

9. The Court has had the benefit of hearing and seeing the Government's evidence in the Count Two charge against Defendant Mauldin and the Counts Three, Four and Five charges against

Defendant Holland, presented in the first trial in which a mistrial was granted due to a "hung jury". The entire record indicates separate alleged federal statutory criminal violations not commenced with the underlying motive of stifling or interfering with the Defendants' legitimate First Amendment rights to voice opposition to the federal income tax laws and/or the national monetary system.